IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | BANKRUPTCY NO. 24-51145 MMP |
| | § | |
| RIVER SUB, LLC | § | (Subchapter V Debtor) |
| | § | |
| DEBTOR | § | CHAPTER 11 PROCEEDING |

### DECLARATION OF CATHY AMATO IN SUPPORT OF FIRST-DAY MOTIONS

I, Cathy Amato, state and declare as follows:

1. I am over 18 years of age and if called upon I would competently testify to the matters set forth herein based upon my personal knowledge of the Debtor, its business operations, history, industry, and books and records, and based upon information contained in the Debtor's books and records. I am qualified to give this declaration (the "First Day Declaration") on behalf of the Debtor.

2. I am a co-manager and one of three equity owners of River Sub, LLC[1] ("River Sub" or "Debtor"), the Debtor in the above styled chapter 11 case.

3. I submit this Declaration in support of the following motions (collectively, the "First Day Motions"):

   a. Debtor's Emergency Motion for an Order Under 11 U.S.C. §§105, 363, and 507 (I) Authorizing Payment of Pre-Petition Employee Obligations and Related Amounts, (II) Confirming Debtor's Right to Pay Withholding and Payroll-Related Taxes and (III) Directing Banks to Honor Pre- Petition Checks for Employee Obligations (the "Prepetition Wages Motion");

   b. Debtor's Emergency Motion for Entry of Order Authorizing Debtor to Maintain Pre-Petition Bank Accounts and Granting Related Relief ("Bank Account Motion"); and

   c. Debtor's Emergency Motion for Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of

---

[1] I own 33.6633% of the member interests in River Sub LLC through CA Synergies, LLC. The remaining member interests are owned by 1987 MGJ, LLC (33.663%) an entity owned by Martha Jordan and Two Guys Holdings, LLC (32.6734% owned by Rick Riley.

*Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment ("Utility Motion").*

## BACKGROUND

4. On June 20, 2024 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby initiating the above-captioned bankruptcy case and creating its bankruptcy estate (the "Estate"). The Debtor sought relief under Subchapter V of Chapter 11 of Title 11 of the U.S. Code.

5. The Debtor continues to operate and to manage its business as "debtor-in- possession" pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the above-captioned bankruptcy case (the "Chapter 11 Case") pursuant to Section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Chapter 11 Case at this time.

6. River Sub was founded in 1991 by Martha Jordan, Cathy Amato, and Rick Riley to open and operate Subway restaurants in San Antonio and surrounding areas. In 1991 River Sub entered into a franchise agreement with Doctor's Associates, LLC, the franchisor for Subway restaurants.

7. The company's strategy was to open Subway restaurants in a variety of markets, including markets deemed demographically undesirable by other quick service restaurant operators. We hired local team members in those neighborhoods and helped boost the local economy. River Sub became a preferred Subway employer throughout San Antonio and outlying communities. River Sub has continuously employed a majority of minority and low-income team members and developed them into future leaders for Subway.

8. River Sub is a women owned business that has always been ahead of the curve when it comes to providing benefits and resources for its valued employees. River Sub values developing and promoting from within its ranks and currently 90% of all management began as sandwich artists.

River Sub believes that everyone should have a fair work schedule and offer their team flexible time off as well as paid vacation for tenured employees. River Sub has offered a rich health care plan for the team members since 2000, before mandates required it and works diligently on ways to help improve out of pocket costs for the team members that depend on it.

9. More than 35% of employees have been employed by River Sub for five years or more. Many employees have been with River Sub for ten and even as many as twenty years. In the very transient restaurant industry, this attests to the fact that River Sub has been considered a fair and equitable employer by our team and we value their contributions.

10. River Sub believes in rewarding superior performance and has a variety of bonus programs that are available for team members to be part of from the first day of employment. As the largest Subway multi-unit franchise group in South Central Texas, we have set the example for employment practices for other franchisees to follow.

11. River Sub is the regional leader in key restaurant metrics and our restaurants are used to train other Subway franchisees throughout the United States. Both I and Martha Jordan serve or have served in the past on Subway franchisee associations, Subway advertising boards and other advisory committees of Subway franchisees.

12. In 2012, at the peak period of Subway's sales, River Sub owned 69 restaurants. Due to restaurant saturation as well as the COVID pandemic, River Sub closed some restaurants but currently operates 48 Subway Restaurants throughout the San Antonio and surrounding markets. During COVID, despite a reduction of over 80% in sales, River Sub worked to keep every team member employed of those who wanted to continue to work as well as held jobs for those who promised to return when the pandemic lock down was lifted.

13. Gross sales for 2023 were slightly less than thirty million dollars. River Sub employs 454 employees, 173 full time, 281 part time. This group consists of 387 sandwich artists, 54 restaurant

and multi-unit managers, and 7 executive and administrative staff. Martha Jordan and I actively manage the business, Rick Riley retired in 2021. Each of River Sub's members has extensive business experience and has been involved in the restaurant industry for more than 30 years.

14. River Sub Subways are known throughout the community for their community involvement and volunteerism. The ownership and team have been known to volunteer at health walks, national night out, local school fundraisers, and other community events. Personally, I have served on the board of Haven for Hope (2013 to present) and Wildlife Rescue (2014 to present).

## THE FIRST DAY MOTIONS

15. Contemporaneously herewith, the Debtor has filed the First Day Motions listed above seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, minimize the adverse effects of the commencement of the Chapter 11 Case, and facilitate the efficient administration of the Chapter 11 Case. In connection with the preparation for this bankruptcy proceeding, I have reviewed each of the First Day Motions. I believe that the entry of orders granting the relief requested in these Motions is critical to the Debtor's ability to continue in operation, and thus maximize the return to its estate and creditors.

A. <u>Motion to Pay Pre-Petition Wages</u>

16. The Debtor employs 454 employees, 173 full time, 281 part time. This group consists of 387 sandwich artists, 54 restaurant and multi-unit managers, and 7 executive and administrative staff. The employees provide services exclusively to River Sub. River Sub funds the entire payroll (including 940 and 941 taxes) to Paychex on a pass-through basis. Currently all employees earn and are paid compensation on a weekly basis.

17. The Debtor pays its payroll weekly. The weekly payroll runs from Wednesday to the following Tuesday as is paid on Friday by Paychex, the Debtor's payroll service provider. River Sub funds the payroll to Paychex each Thursday by ACH. The Debtor's next weekly payroll will be for

the period from June 19 through June 25, 2024, to be paid on July 1, 2024. The weekly payroll must be funded on or before June 27, 2024, in order for payroll to be timely processed. As of the Petition Date, the Debtor estimates its pre-petition gross payroll and related benefit obligations will be approximately $90,074, including all related tax burden, employee tips, reimbursements and other related benefits as disclosed in the Prepetition Wages Motion (the "Pre-Petition Wages").

18. All of the employees' Pre-Petition Wages that the Debtor seeks to pay are less than the priority wage allowance of $15,150 under Section 507(a)(4) of the Bankruptcy Code. A breakdown of the employee salaries by employee will be provided to the U.S. Trustee's office.

19. The Debtor seeks authority to pay all (i) Pre-Petition Wages, (ii) Withholdings, and (c) Employee Benefits, totaling approximately $90,074.

B. Bank Account Motion.

20. In the ordinary course of business, the Debtor utilizes a centralized cash management system (the "Cash Management System") through which funds are received, consolidated, and disbursed to pay various business-related expenses. The Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Among other benefits, the Cash Management System permits the Debtors to accurately monitor cash availability at all times and also permits the Debtors to manage and track the collection and transfer of funds, thereby reducing administrative burdens and expenses.

21. On a daily basis, the Debtor processes a large number of transactions through the Cash Management System. In doing so, the Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between bank accounts by various methods, including by check, wire transfer, automated clearing house transfer, and electronic funds transfer. The Debtor maintains current and accurate records of all transactions processed through the Cash Management System.

22. The Cash Management System includes four operations accounts consisting of a primary operating account at Frost Bank (the "Concentration Account") and three more "deposit accounts" with other banking institutions which are maintained for remote restaurant operations where Frost does not maintain a branch bank. The deposit accounts are swept periodically into the Concentration Account. Credit Card receipts are also deposited directly into the Concentration Account.

23. The Debtor maintains three additional accounts at Frost Bank on account is a payroll account, the second is for deposit of sales taxes and the final account is the account the Debtor uses for ACH payments to vendors, lessors and its royalty payment to its franchisor.

24. The Debtor accepts payments from customers by debit and credit card. Debit/credit card payments account for a significant portion of the Debtor's sales. The Debtor has a payment processing agreement with Adyen to process payments by credit and debit card. Adyen is a large multinational corporation and has a significant presence in the credit card processing space, processing over $800 billion in payments annually.

25. Due to the nature of the Debtor's business, it has a low chargeback experience. While it is possible, if not unlikely, that a chargeback for the sale of food pre-petition might occur the amounts of such chargebacks would be insignificant. In any event, such a chargeback initiated by a customer might be entitled to priority under section 507(a)(7).

26. The Cash Management System facilitates control, forecasting, reporting, and monitoring processes that are vital to Debtor's business. Requiring the Debtor to close its existing accounts and open new accounts with approved DIP Banks would pose a significant risk to the Debtor's business. In the first instance, there may not be approved DIP Banks in the regions where the Debtor maintains its deposit accounts for remote restaurants. In addition, changing its credit card

processor would interrupt customer sales for customers choosing to pay by credit/debit card and would delay receipt of payments as the card processor and depository accounts were replaced.

27. Based on the foregoing, the Debtor respectfully requests that the Court allow it to operate each of the Bank Accounts, as such were maintained in the ordinary course of business before the Petition Date, and to operate as normal under the Credit Card Processing Agreement.

C. Utility Motion.

28. In connection with the operation of its business, the Debtor obtains electricity, water, telecommunications and other similar services from a number of utility providers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations.

29. Without access to electric and water service, the Debtor would have to immediately cease operations at all of its 48 restaurants. The lack of those vital utilities would violate health and safety ordinances in the communities where the Debtor operates. Moreover, interruption of electrical service would expose its inventory of perishable food items to spoilage at tremendous cost the Debtor's Estate.

30. To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

31. River Sub has never defaulted on its obligations to its Utility Companies and has adequate cash flow to remain current on its obligations to those creditors. The Debtor's cash flow is not encumbered; accordingly, River Sub generates sufficient liquidity to meet all of its operating expenses as they come due.

**Proposed Adequate Assurance**

32. River Sub intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

33. The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

34. The Utility Motion provides an adequate remedy for Utility Companies to seek additional relief from the Debtor and ultimately if it remains unsatisfied, to come before this Court.

35. 117. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

36. To the extent that I subsequently discover any facts bearing on this Declaration, this Declaration will be supplemented, and those facts will be disclosed to the Court at the earliest opportunity.

Pursuant to 28 U.S.C. §1746(2) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 20. 2024.

_____ _____
Cathy Amato, Manager of River Sub, LLC.

32. River Sub intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

33. The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

34. The Utility Motion provides an adequate remedy for Utility Companies to seek additional relief from the Debtor and ultimately if it remains unsatisfied, to come before this Court.

35. 117. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

36. To the extent that I subsequently discover any facts bearing on this Declaration, this Declaration will be supplemented, and those facts will be disclosed to the Court at the earliest opportunity.

Pursuant to 28 U.S.C. §1746(2) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 20. 2024.

_____
Cathy Amato, Manager of River Sub, LLC.